# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

DOUGLAS GUNNINK, JANET
GUNNINK, RAYMOND YOKIEL, as the
Trustee for the PRAIRIE'S EDGE TRUST,
and RACHEL FRAUENDIENST,

Defendants.

CIVIL NO. 12-1528 (MJD/TNL)

## REPORT AND RECOMMENDATION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on the Government's Motion for Summary Judgment (ECF No. 121). The Court heard oral argument on the Government's Motion. Mark C. Milton appeared for the Government. No appearance was made on behalf of Defendants. Based on all the files, records, and proceedings herein, the Court will grant the motion.

## I.   FACTS

### A. Douglas Gunnink's Tax Liabilities

Douglas Gunnink has not filed a federal income tax return since 1997. (Yarger Decl. ¶ 4.) In 1994, the business "Moms Dairy" filed a Form 1041 trust tax return listing Douglas Gunnink as the trustee. (*Id.* ¶ 5.) In 1997, Douglas Gunnink was the lone signatory on Moms Dairy's bank account. (*Id.* ¶ 5.) Moms Dairy did not file a tax return in 1997, but records show that it collected over $100,000 from customers that year. (*Id.*)

1

The IRS assigned the income deposited into the Moms Dairy account to Douglas Gunnink individually for tax year 1997. (*Id.*) The IRS also determined that Douglas Gunnink received $41,151 in wages, interest income of $872, and $1,522 in non-employee compensation in 1997. (*Id.* ¶ 6.) On March 30, 2001, the IRS sent Douglas Gunnink a Notice of Deficiency, informing him that the IRS determined that he owed $49,682.00 in taxes and $19,790.75 in statutory penalties. (*Id.* Ex. 3.) The Notice further stated that penalties and interest would continue to accrue until the tax debt was satisfied. (*Id.*)

Douglas Gunnink failed to file federal tax returns for tax years 2003-2008. (*Id.* ¶ 9.) Throughout that period, Douglas Gunnink operated a farming and livestock operation in Gaylord, Minnesota. (*Id.* ¶ 10.) The Government determined Douglas Gunnink's tax liability for that period by corresponding with his customers, analyzing banking records for accounts under the names of entities he owned or controlled, and reviewing third-party information returns. (*Id.* ¶ 11.) From 2003 to 2008, Douglas Gunnink's customers made payment for goods and services to Douglas Gunnink, Graziers Supply Management ("GSM"), Dutch Mill, and Farm Factor Investments, LLC ("FFI"). (*Id.* ¶ 12.) Records showed that Douglas Guninnk deposited payments made directly to him into these accounts. (*Id.*) The bank accounts held under these entities' names were all controlled by Douglas Gunnink, and none of these entities filed federal tax returns for tax years 2003-2008. (*Id.*)

After analyzing the bank accounts of GSM, Dutch Mill, and FFI, the Government determined that Douglas Gunnink earned farming income for tax years 2003 to 2008 as

follows: $72,068 in 2003; $131,412 in 2004; $391,659 in 2005; $541,294 in 2006; $1,280,771 in 2007; and $1,996,715 in 2008. (*Id.* at ¶ 13; *id.* Exs. 4-9.)

For tax years 2003, 2004, and 2005, Douglas Gunnink received IRS Forms 1099-PATR for patronage dividends from Ag Land Co-op for $65, $242, and $247, respectively. (*Id.* ¶ 14.) For tax years 2007 and 2008, Douglas Gunnink received IRS Forms 1099-PATR for patronage dividends from United Farmers Coop for $48 and $89, respectively. (*Id.* ¶ 15.) For tax years 2003 through 2008, Douglas Gunnink received IRS Forms 1099-INT for interest income from State Farm Life Insurance Company detailing interest income as follows: $351 in 2003; $342 in 2004; $363 in 2005; $392 in 2006; $442 in 2007; and $365 in 2008. (*Id.* ¶ 16.)

The IRS sent Douglas Gunnink a notice of deficiency, or 90-day letter, on June 20, 2011. (*Id.* Ex. 10.) In the letter, the IRS informed Douglas Gunnink of what it determined to be his unpaid tax liabilities for tax years 2003-2008. (*Id.*) The Letter also informed Douglas Gunnink that he had "90 days from the date of this letter . . . to file a petition with the United States Tax Court for a redetermination of the deficiency." (*Id.*) Douglas Gunnink did not file a petition with the U.S. Tax Court. After giving notice and making demand for payment, the IRS made the several assessments for tax years 2003-2008 totaling $3,992,729.85. (Wallin Decl. ¶ 6.)

### B. Douglas Gunnink's Civil Penalty Assessments

#### 1. Frivolous Submission Penalties under 26 U.S.C. § 6702

On December 1, 2005, the IRS received two claims for refund and requests for abatement from Douglas Gunnink for tax years 1996 and 1997. (*Id.* ¶ 8; Ex. 1.) Gunnink

attached to his claims a 28-page "Notice to Issue Certificate of Release for Inchoate Notice of Federal Tax Lien," demanding that the IRS release and "extinguish [its] determination that [he] has a federal tax liability." (*Id.*) After evaluating the claims in Gunnink's "Notice," the IRS determined that his arguments were frivolous and sent notice to Douglas Gunnink of this determination. (*Id.* ¶ 9, Ex. 2.) On October 11, 2006, the IRS received a "Verified Notice to Abate Alleged Federal Tax Liability" from Gunnink. (*Id.* Ex. 3.) After receiving several what it determined to be frivolous submissions advancing meritless arguments, the IRS assessed civil penalties against Gunnink under 26 U.S.C. § 6702 totaling $1,184.00 for tax year 1996 and $1,000.00 for tax year 1997. (*Id.* ¶ 11.)

### 2. Dyed-Diesel Fuel Penalties under 26 U.S.C. § 6715

On April 5, 2011, Minnesota State Police determined that Douglas Gunnink was driving on a public highway with red-dyed (non-taxed) diesel fuel in his gas tank. (*Id.* ¶ 12, Ex. 4.) Gunnink admitted that he had put red-dyed diesel into his gas tank from the storage tank on his farm. (*Id.*) An analysis prepared by Excise Forensics Laboratory in Richland, Washington, confirmed the presence of red-dye diesel in Gunnink's tank. (*Id.* Ex. 5.) After receiving the laboratory confirmation, the IRS assessed a penalty to Gunnink under 26 U.S.C. § 6715 in the amount of $2,092.00. (*Id.* ¶ 13.)

### 3. Federal Tax Liens on Gunnink's Property

Around November 2, 1992, Douglas Gunnink and his wife, Janet Gunnink, acquired a warranty deed to a 160-acre property located at 25303 461st Avenue, Gaylord,

Minnesota ("the Farm"), as joint tenants. (*Id.* ¶ 23; Milton Decl. Ex. 14, Deposition of Douglas Gunnink ("Gunnink Dep."), 33.) The Farm comprises two adjacent parcels:

> The South Half of the Northwest Quarter and the South Seventy (70) acres of the North Half of the Northwest Quarter (S1/2 of NW1/4 & S. 70 acres of N1/2 of NW1/4) and the North Ten (10) acres of Government Lot Number 1 (1#) (hereinafter "Parcel One")

> The East Twelve (E 12) acres of the South Twenty-five and forty-five one hundredths (S 25.45) acres of Government Lot One (1) and of the West Twenty-three and ninety-four hundredths (W 23.94) acres of Government Lot Two (2), all in Section Twenty-two (22) in Township One Hundred Thirteen (113) North, Range Twenty-eight West, of the 5th Principal Meridian (hereinafter "Parcel Two").

(Wallin Decl. ¶ 23, Ex. 13.) The Gunninks reside in a house on Parcel One. (Milton Decl. Ex. 15, Deposition of Janet Gunnink ("J. Gunnink Dep."), 12-13.) Parcel Two is vacant and was seized and sold by the Minnesota Department of Revenue in 2006. (Wallin. Decl. ¶ 26; J. Gunnink Dep. 66-68.)

The IRS filed notices of federal tax liens against Gunnink with the Sibley County Recorder's Office on May 12, 2005, for tax year 1997; on September 20, 2006, and March 10, 2011, for penalties arising from tax years 1996 and 1997; and November 16, 2011, for tax years 2003-2008 and a penalty from tax year 2011. (Wallin Decl. Exs. 6, 7, 9, and 12.)

### 4. Transfer of the Farm to Prairie's Edge Trust

On April 20, 2005, the Gunninks executed a quit claim deed, transferring the Farm to the Prairie's Edge Trust "by and through it's [sic] first trustee, Raymond Yokiel, and other future trustees." (Wallin Decl. Ex. 15.) Gunninks did not receive any money for the transfer. (J. Gunnink Dep. 129-30.) In December 2007, Yokiel stated that his role as

trustee of the Prairie's Edge Trust was "nothing really" and that he didn't think he'd "done anything as trustee." (Milton Decl. Ex. 16, Dec. 4, 2007 Deposition of Raymond Yokiel, 8.) After Yokiel resigned as trustee of the Prairie's Edge Trust, (Milton Decl. Ex. 17, Feb. 26, 2013 Deposition of Raymond Yokiel, 30-33), Douglas Gunnink became "trustee." (Gunnink Dep. 37, 62-63; J. Gunnink Dep. 38-39.) Janet Gunnink is also a "trustee" for Prairie's Edge Trust. (Gunnink Dep. 38-39.) The IRS filed notice of nominee tax liens against Prairie's Edge Trust as the Nominee of Douglas Gunnink and Janet Gunnink on January 29, 2007; June 20, 2011; and July 20, 2011. (Wallin Decl. Exs. 8, 10-11.)

The Gunninks continue to live on the Farm to this day. (Gunnink Dep. 22, 23, 26; J. Gunnink Dep. 12-13, 17.)  Their son, Zachary Gunnink, took over the day-to-day farming operations in 2010. (Gunnink Dep. 57-58, 59.) According to the Gunninks, Zachary pays his parents' living expenses in exchange for his right to farm the land. (*Id.* 61-62; J. Gunnink Dep. 131-32.) Both Douglas Gunnink and Janet Gunnink continue to work on the farm. (J. Gunnink Dep. 18-19.)

On April 27, 2006, the Minnesota Department of Revenue ("MDOR") seized and sold Parcel Two to collect on the Gunninks' joint state income tax liabilities; the MDOR, however, did not provide the IRS with notice of the forced sale. (Wallin Decl. ¶ 26, Ex. 16.) At the sale, Defendant Rachael Frauendienst purchased Parcel Two for $21,000. (*Id.*)  Frauendienst and her husband, Darrel Frauendienst, later executed a quit-claim deed for Parcel Two to herself, Cory Swenson, and Erin Swenson, each with a one-third interest in the property.

## II.    PROCEDURAL HISTORY

The Government instituted this action on June 26, 2012, seeking to reduce to judgment the federal tax assessments and penalties and to foreclose corresponding federal tax liens encumbering the Farm. (ECF No. 1.) In response, Douglas Gunnink sent and filed a "Notice of Fault – Opportunity to Cure." (ECF No. 2.) This filing included copies of, among other things, a Constructive Notice of Conditional Acceptance (ECF No. 2-2 at 1), a Notice of Tender for Setoff (ECF No. 2-8 at 9), and a "coupon" for $11,700,000.00 (*id.* at 18.) The Court construed this filing as an Answer to the Complaint and the case proceeded. (*See* ECF No. 19.)

Throughout the history of this litigation, the Gunninks refused to cooperate with the Government's discovery efforts and deposition requests. (*See* Mot. to Compel, ECF No. 40; Mot. to Compel, ECF No. 54.) In response, the Government moved to hold Douglas Gunnink in contempt of court for failing to provide a meaningful response to a document request in violation of an August 19, 2013, Order of this Court. (ECF No. 79.) On January 16, 2014, the Honorable Michael J. Davis, United States Chief District Judge for the District of Minnesota, adopted this Court's report and recommendation (ECF No. 109) and granted the Government's Motion. (ECF No. 110.) Gunnink could purge the contempt by (1) paying the Clerk of Court $1,317.36 for the Government's reasonable costs and attorneys' fees, and (2) complying with this Court's August 19, 2013 Order compelling discovery responses. (*Id.*)

The Government filed the instant Motion for Summary Judgment on April 10, 2014. (ECF No. 121.) This Court held a hearing on the motion on June 18, 2014; no

appearance was made on behalf of any named defendant, including Douglas Gunnink. (ECF No. 131.) To date, Douglas Gunnink has neither filed any papers in response to the Government's Motion for Summary Judgment nor satisfied the Court's purge conditions. He remains in contempt of Court.

## III.    ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant has the burden of demonstrating that no genuine issue of material fact remains to be decided. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a motion for summary judgment has been made and supported by the pleadings and affidavits, the burden shifts to the party opposing the motion to demonstrate that a disputed issue of material fact remains. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

### B.  Reducing Tax Assessments to Judgment

#### 1.  Unpaid Federal Tax Assessments

It is well established that the Commissioner's determination of tax deficiency is presumptively correct, "and the taxpayer bears the burden of proving that the determination is arbitrary or erroneous." *Day v. Comm'r*, 975 F.2d 534, 537 (8th Cir. 1992) (citing *United States v. Janis*, 428 U.S. 433, 440-41 (1976)). If a taxpayer fails to present evidence that the Commissioner's tax determination was arbitrary or erroneous, then the United States is entitled to summary judgment. *Lane v. United States*, 328 F.2d

602, 603 (5th Cir. 1964). Certificates of Assessments and Payments are generally sufficient to show that the assessments were made in accordance with statutory and regulatory requirements. *Untied States v. Bisbee*, 235 F.3d 1001, 1006 (8th Cir. 2001). For summary judgment purposes, Certificates of Assessments and Payments are sufficient to satisfy the Government's burden of making a prima facie case; the defendant then bears the burden of demonstrating that the Government's computation is incorrect. *United States v. Neal*, 244 F.R.D. 638, 643 (W.D. Ark. 2008). Courts must accept the Commissioner's method of reconstructing income so long as that method is rationally based. *Rowell v. Comm'r*, 884 F.2d 1085, 1087 (8th Cir. 1989).

In his correspondence with IRS officials, Douglas Gunnink argued that neither he nor his wife had earned any taxable income because they are neither resident aliens nor foreign corporations. *See, e.g.*, Yarger Decl. Ex. 2 at 2. This argument is meritless. The Internal Revenue Code (the "Code") defines "gross income" as "all income from whatever source derived . . . including (but not limited to) . . . [c]ompensation for services, including fees, commissions, fringe benefits, and similar items," 26 U.S.C. § 61(a), and it is well-settled that this includes United States taxation income earned by United States citizens from sources within the United States. *E.g.*, *Christopher v. Comm'r*, 2002 WL 71029, at *3 (U.S. Tax Ct. 2002) (citing, *inter alia*, *Madge v. Comm'r*, 23 Fed. Appx. 60, 2001 WL 1313215, at *1 (8th Cir. 2001)).

In this case, the Government used data obtained from third-party information returns (e.g., IRS Forms W-2 and 1099), bank records, and information provided by Douglas Gunnink's customers to reconstruct his income for the tax years in question. By

Gunnink's own admission, he does not maintain regular business records. "When a taxpayer keeps no books or records and has large bank deposits, the [IRS] is not arbitrary or capricious in resorting to the bank deposits method of computing income." *Clayton v. Comm'r*, 102 T.C. 632, 645 (1994). Moreover, Defendant has presented no evidence that the Government's determinations were incorrect. In light of the "great latitude" granted the Government's determinations, *Gleason v. Comm'r*, 101 T.C.M. (CCH) 1743 (T.C. 2011), the Court concludes that the Government has met its burden to show that the agency used reasonable and logical means to determine Douglas Gunnink's tax liabilities.

### 2.  Penalties for Frivolous Submissions under 26 U.S.C. § 6702

Tax penalties for frivolous submissions under § 6702(a) are appropriate where a taxpayer (1) files what purports to be a tax return, but the filing (a) "does not contain information on which the substantial correctness of the self-assessment may be judged" or (b) "contains information that on its face indicates that the self-assessment is substantially incorrect;" and (2) the information contained on the purported return is "based on a position which the [IRS] has identified as frivolous" or "reflects a desire to delay or impede the administration of Federal tax laws." 26 U.S.C. § 6702(a). This penalty provision was instituted "in an effort to deter tax protestors from filing frivolous returns." *Kahn v. United States*, 753 F.2d 1208, 1214 (3d Cir. 1985) (citation to legislative history omitted). Under the statute, a "return" is a document that seeks to obtain a refund. *Nichols v. United States*, 575 F. Supp. 320, 322 (D. Minn. 1983). The Government must establish a taxpayer's liability for civil penalty assessments by a

preponderance of the evidence. *See* 26 U.S.C. § 6703(a); *Mattingly v. United States*, 924 F.2d 785 (8th Cir. 1991).

In his submissions to both the IRS and this Court, Douglas Gunnink has advanced the argument that the IRS erred by failing to compute the basis of "the fair market value of [Gunnink's] labor property [sic] in connection with the performance of services" when determining his gross income. (Wallin Decl., Ex. 1 at 17.) At the root of Douglas Gunnink's position is the argument that his wages are not income for purposes of computing his federal tax liability. This argument, also called the "Section 83 argument," is meritless. *E.g.*, *Denison v. Comm'r*, 751 F.2d 241, 242 (8th Cir. 1984) (per curiam) (rejecting as frivolous taxpayer's argument, *inter alia*, that wages are not income). After careful review of the record, the Court determines that the Government has shown by a preponderance of the evidence that Douglas Gunnink's submissions were frivolous.

### 3.  Douglas Gunnink's Liability under 26 U.S.C. § 6715

Section 6715 of the Code allows the IRS to impose a penalty where a taxpayer used dyed diesel fuel for taxable purposes and had reason to know the fuel was dyed. *E.g.*, *Consolidated Edison Co. of NY v. United States*, 34 F. Supp. 2d 160, 164-65 (S.D.N.Y. 1998).

Minnesota State Police found Douglas Gunnink driving on public roads using dyed diesel for taxable purposes. Douglas Gunnink admitted that he had put dyed diesel in his fuel tank from the storage tank on the Farm.  After receiving confirmation that the diesel was dyed, the IRS assessed a penalty of $2,000.00 against Douglas Gunnink. Other than his frivolous submissions discounted above, Douglas Gunnink has offered no

argument that this assessment is improper or otherwise not in accordance with § 6715. Accordingly, after careful review of all the files, records and proceedings herein, the Court determines that the $2,000.00 penalty under § 6715 is appropriate.

### 4. Summary Judgment is appropriate

The Government has come forth with sufficient evidence to support the validity of the tax penalties and assessments set forth above. Specifically, the Government has provided Certificates of Assessment and Payment. (Milton Decl. Exs. 1-10.) Statutory penalties, interest, and costs have continued to accrue on these assessments and penalties. After the Government produces Certificates of Assessment, the burden shifts to the taxpayer to show that the assessments are erroneous. *E.g.*, *United States v. Neal*, 255 F.R.D. 638 (W.D. Ark. 2008).

Despite his many filings, Douglas Gunnink has come forth with no competent evidence that the Government's Certificates or its underlying determinations were incorrectly computed or erroneous. Accordingly, the Court will recommend granting summary judgment on the federal tax assessment and statutory penalties, including all penalties and interest.

## C. Reducing Judgments to Liens against the Farm

### 1. Tax Liens for 1997 Attach to the Farm

The Government further seeks an order enforcing tax liens and ordering the sale of the Farm. Where the Government gives the delinquent taxpayer notice of the assessment and makes demand for payment, the Code imposes a federal tax lien "upon all property, whether real or personal, belonging to" a delinquent taxpayer. 26 U.S.C. § 6321. The tax

lien arises automatically at the time of the assessment and continues thereafter until the tax liability either is satisfied or becomes unenforceable by lapse of time. 26 U.S.C. §§ 6321, 6322; *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 719 (1985). "The lien arises in favor of the government at the time an assessment of the unpaid taxes is made against the delinquent taxpayer." *Horton Dairy, Inc. v. United States*, 986 F.2d 286, 290 (8th Cir. 1993) (citing 26 U.S.C. § 6322).

The Government sent notices of assessments to Douglas Gunnink and made demands for payment on the following dates: September 10, 2001; April 24, 2006; April 2, 2007; October 17, 2011; and October 24, 2011. Accordingly, corresponding liens arose on all of Douglas Gunnink's property as of those dates. *Id.*

The Gunninks acquired the Farm as joint tenants on November 2, 1992. The Government noticed and demanded payment from Douglas Gunnink for federal tax assessments arising from tax year 1997 on September 10, 2001. Accordingly, a federal tax lien for the tax year 1997 deficiency attached to all of Douglas Gunnink's property and rights to property, including his one-half interest in the Farm, on September 10, 2001. The Gunninks transferred the Farm to Prairie's Edge Trust in April 2005, several years after the federal tax lien for tax year 1997 was established. This transfer, even if valid, "does not affect the lien, for 'it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere' . . . ." *United States v. Bess*, 357 U.S. 51, 57 (1958) (quoting *Burton v. Smith*, 38 U.S. 464, 483 (1839)). Accordingly, the federal tax lien for tax year 1997 attached to Douglas Gunnink's property interest in the Farm.

### 2. All Remaining Federal Tax Liens Are Enforceable Against the Farm

#### a. Transfer of the Farm to Prairie's Edge Trust Was Fraudulent

With respect to Parcel One of the Farm, the Government argues that the federal tax liens that attached to Douglas Gunnink's interest in the property can be enforced against Prairie's Edge Trust because the April 2005 transfer of the Farm to Prairie's Edge Trust as a fraudulent transfer. It is well-settled that the Government may collect on the tax debts of a taxpayer by foreclosing tax liens on the taxpayer's property that has been fraudulently transferred to another entity. *See United States v. Scherping*, 187 F.3d 796, 804-05 (8th Cir. 1999), *cert. denied* 528 U.S. 1162. *See also United States v. Spencer*, 2005 WL 2648688 at *2 (D. Minn., Oct. 17, 2005) ("A Federal tax lien attaches to a property that has been fraudulently transferred."), citing *United States v. Williams*, 514 U.S. 527, 539 (1995), and *United States v. Jones*, 631 F. Supp. 57, 60-61 (W.D. Mo. 1986). Whether a conveyance is fraudulent is a matter of state law. *Id.* at 804 (citing *Loving Saviour Church v. United States*, 556 F. Supp. 688, 691 (D.S.D. 1983)). If the creditor demonstrates sufficient badges of fraud, the burden of production shifts to the party contending that the conveyance at issue was not fraudulent. *United States v. Bigalk*, 654 F. Supp. 2d 983, 991 (D. Minn. 2009).

The Minnesota Uniform Fraudulent Conveyance Act, Minn. Stat. § 513.44, provides

> (a) A transfer made or obligation incurred by a debtor is fraudulent
> as to a creditor, whether the creditor's claim arose before or

after the transfer was made  or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

    i. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

    ii. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The Government argues that the conveyance should be set aside under § 513.44(a)(2) because no genuine issue of material fact exists that the Gunninks transferred the Farm to Prairie's Edge Trust without receiving a reasonably equivalent value after the IRS assessed taxes and penalties for tax year 1997 while Douglas Gunnink was incurring debts beyond his ability to pay—specifically, the tax debts the Government seeks to collect in this action. (Mem. in Supp. at 29-30.)

In the alternative, the Government argues that the transfer can be set aside because it was made with the actual intent to hinder, delay, or defraud the IRS. (Mem. in Supp. at 23-26.) In determining intent under § 513.44(a)(1), courts should consider, among other factors, whether: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property after the transfer; (3) the transfer was disclosed or concealed; (4) the debtor had been sued or threatened with suit before the transfer was

made; (5) the transfer was substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the business. Minn. Stat. § 513.44(b)(1)-(11). Courts use these factors to "establish actual intent through the examination of circumstantial evidence or 'badges of fraud.'" *Sherping*, 187 F.3d at 804 (citing *Citizens State Bank v. Leth*, 450 N.W.2d 923, 927 (Minn. Ct. App. 1990) (applying Minn. Stat. § 513.44)). Importantly, this list is not exclusive, and courts are free to consider any other factors relevant to the issue of intent to defraud. *Sherping*, 187 F.3d at 804.

The Court determines that the transfer should be set aside. The Gunninks transferred the Farm to Prairie's Edge Trust in April 2005. The quit claim deed states that consideration was less than $500, and Janet Gunnink stated that they received no money in exchange for the Farm. According to either version, it is undisputed that Gunninks did not receive the reasonably equivalent value of the Farm in the transfer. Moreover, by that point in time, Douglas Gunnink had received a notice of deficiency from the IRS informing him that he owed almost $70,000.00 in taxes and penalties. Douglas Gunnink had not filed returns for tax year 2003, and his liability for tax year 2003 arose "on the date each return was due to be filed and the taxes were required to be paid." *Bigalk*, 654 F. Supp. 2d at 991 (citing *Scherping*, 187 F.3d at 805). The record before the Court

shows that Douglas Gunnink continued not to file returns for tax years 2004-2008. The Gunninks have not provided any other documents, records, receipts, or statements establishing any deductions to which they are entitled for the tax years in question that might reduce their tax liabilities. *See* 26 U.S.C. § 6001 (requiring taxpayers to maintain sufficient records to show whether or not such a person is liable for the tax assessed). Accordingly, the Court determines that no genuine issue of material fact exists that the Gunninks did not receive a reasonably equivalent value after the IRS assessed taxes and penalties for tax year 1997 and while Douglas Gunnink was incurring debts beyond his ability to pay.

In addition, after carefully considering each of the factors in § 513.44(b) and the files, records and proceedings herein, the Court determines that Gunninks transferred the Farm to Prairie's Edge Trust with the intent to hinder, delay, or defraud the Government. First, Prairie's Edge Trust has been at all relevant times controlled by the Gunninks. Although Yokiel was the named trustee, Yokiel stated at deposition that never did anything as trustee, and he had no recollection of having meetings or conversations about Prairie's Edge. Indeed, two days after his first deposition, Yokiel resigned as trustee out of concern about his involvement with the Trust. According to Yokiel, this resignation letter is the only document related to Prairie's Edge Trust in his possession. After Yokiel resigned, Douglas and Janet Gunnink became the trustees.

Despite having sold the Farm to the Prairie's Edge Trust, Gunninks continue to live on the property and work the Farm as they did before the transfer. According to both Douglas and Janet Gunnink, the transfer had occurred sometime earlier, but they did not

execute the quit-claim documents until April 2005. The Gunninks did not receive reasonable consideration for the fair market value of the Farm when they transferred it to Prairie's Edge Trust, and Douglas Gunnink has provided no documentation of any separate financial records or bank accounts for Prairie's Edge Trust. Moreover, the Gunninks transferred the Farm to Prairie's Edge Trust shortly after they incurred substantial debt in the form of tax liabilities for tax year 2003 and shortly before they incurred tax liabilities for tax years 2004-2008, not to mention the liabilities for tax years 1996 and 1997. The only action Yokiel, the purported "trustee" of Prairie's Edge Trust at the time of the transfer, stated that he took regarding Prairie's Edge Trust was to sign his resignation letter. The Court also notes that Gunninks have filed with both the IRS and this Court documents advancing frivolous tax-protestor arguments and purporting to show that they have more than satisfied their tax liabilities.

Courts faced with similar facts have determined that earlier transfers of property to trusts to be fraudulent. In *Bigalk*, for example, the court found no genuine issues of material fact as to whether the conveyance of the defendants' farm to a trust was fraudulent where (1) the defendants and his wife continued to occupy and operate the farm after the transfer, (2) the farm was the defendants' principal asset and sole source of income, and (3) the transfer occurred "shortly before they incurred substantial debt in the form of their tax liabilities for 1991 to 1993 and shortly after incurring substantial debt in the form of their tax liability for 1990." 654 F. Supp. 2d at 993. Further, the defendants' "failure to file tax returns for 1991 to 1993 [and] their attempts to avoid paying tax by sending tax protestor rhetoric to the IRS" supported the court's conclusion that the

transfer was fraudulent and could be set aside. *Id.* at 993-94. *See also Scherping*, 187 F.3d at 804-05.

These facts closely parallel the facts of the instant case. Douglas and Janet Gunnink have continued to occupy the Farm after the transfer to Prairie's Edge Trust. According to the papers before the Court, the farming operations were the Gunninks' principal source of income. And the transfer to Prairie's Edge Trust occurred after Douglas Gunnink had incurred substantial debt for tax years 1997 and 2003, and immediately before incurring more tax debt for tax years 2004-2008. Douglas Gunnink continued to eschew filing tax returns in tax years 2004-2008. When contacted by the IRS—both directly with the notices of deficiency and assessment and when this case was filed—Gunnink responded with meritless tax protestor rhetoric that he did not, in fact, owe any taxes.

Based on all the files, records, and proceedings herein, the Court determines that no genuine issue of material fact exists as to whether the Gunninks received a reasonably equivalent value when they transferred the Farm to Prairie's Edge Trust or whether the Gunninks sold the Farm with the actual intent to hinder, delay, or defraud the Government.[1] Accordingly, the Government is entitled to summary judgment on this claim and the sale of the Farm to Prairie's Edge Trust should be set aside.

### b.  Remaining Federal Tax Liens Encumber the Farm

---

[1] Because the Court determines the transaction was fraudulent, it need not address the Government's alter-ego and nominee arguments.

Having set aside the Gunnink's sale of the Farm to Prairie's Edge Trust, the Court must now determine whether the subsequent federal tax liens attach to the Farm. As the Court stated above, the Government sent notices of assessments to Douglas Gunnink and made demands for payment on the following dates: September 10, 2001; April 24, 2006; April 2, 2007; October 17, 2011; and October 24, 2011. The federal tax lien arising on September 10, 2001 attached to Douglas Gunnink's interest in the Farm for his tax deficiency for tax year 1997. Accordingly, corresponding liens attached to all of Douglas Gunnink's property as of those dates. Because the Court determines that the Prairie's Edge Trust transaction was fraudulent and should therefore be set aside, the federal tax liens arising on April 24, 2006, April 2, 2007, October 17, 2011, and October 24, 2011 attached to Douglas Gunnink's interest in the Farm.

### c. Federal Tax Liens Encumber Parcel Two Because MDOR Failed to Provide the IRS with Notice of the Forced Sale

The Government argues that Federal tax liens encumber Parcel Two—the parcel sold to Rachel Fraudenienst on April 27, 2006—because the Minnesota Department of Revenue ("MDOR") failed to provide the IRS with notice of the forced sale as required by statute. Section 7425 of the Code applies where property subject to a federal tax lien is sold in a non-judicial sale. Where notice of a federal tax lien is provided to the county where the property sits more than 30 days before a forced sale of the property, the foreclosing party must provide the IRS notice of the sale to discharge federal tax liens during the non-judicial sale. 26 U.S.C. § 7425(b)(1). In short, a federal tax lien will continue to attach to property sold in a non-judicial sale "so long as the United States

recorded a notice of lien at least thirty days before the sale and it did not receive notice of such sale at least twenty-five days in advance." *Russell v. United States* 551 F.3d 1174, 1179 (10th Cir. 2008); *see also Southern Bank of Lauderdale County v. IRS*, 770 F.2d 1001, 1006 (11th Cir. 1985); *Myers v. United States*, 647 F.2d 591, 596-97 (5th Cir. 1981); *Venture Bank, Inc. v. United States*, 2013 WL 214399 at *4 (D. Minn. Jan. 18, 2013).

The MDOR sale of Parcel Two occurred on April 27, 2006. Thus, for the notice-of-sale requirement to apply under § 7425(b), the IRS needed to file the appropriate notice of federal tax lien with Sibley County on or before 30 days before the sale, or March 28, 2006. The record shows that the IRS filed its first notice of federal tax lien with the Sibley County Recorder's Office on May 12, 2005—more than ten months before the MDOR's forced sale. (Wallin Decl. Ex. 6.) Nothing in the record shows that the MDOR gave the IRS the notice required under § 7425 to extinguish the liens. The Court finds that (1) the IRS filed the appropriate notice of tax lien more than 30 days before the MDOR's forced sale of Parcel Two, and (2) the MDOR failed to provide the IRS notice of the tax sale. Accordingly, the federal tax liens on Parcel two were not disturbed by the MDOR's forced sale.

It is important, however, to clarify exactly which of the tax liens were in place at the time Frauendienst purchased Parcel Two from the MDOR. The forced sale occurred on April 27, 2006. Accordingly, Frauendienst took Parcel Two subject to the tax lien that was noticed and recorded with Sibley County more than 30 days before the date of sale, i.e., the tax lien for tax year 1997 that attached to Douglas Gunnink's property interest in

Parcel Two on September 10, 2001. The remaining tax liens that attached to Douglas Gunnink's property interests were noticed and recorded with Sibley County *after* the forced sale. Therefore, although the tax liens attached to Douglas Gunnink's property, Douglas Gunnink did not have an interest in Parcel Two at that time. Accordingly, the tax liens that were noticed and recorded with Sibley County after the forced sale—i.e., liens arising from Douglas Gunnink's tax deficiency for tax years 2003-2008 and his penalty for tax year 2011—did not attach to Parcel Two.

### D.  Ordering the Sale of the Farm Is Appropriate

#### 1.  Parcel One Should Be Sold

Finally, the Government requests the Court order the sale of the Farm to satisfy Douglas Gunnink's tax debt. "Section 7403 of the Internal Revenue Code authorizes a federal district court to order a sale of property in which a delinquent taxpayer has an interest in order to satisfy that taxpayer's debt." *United States v. Bierbrauer*, 936 F.2d 373, 374 (8th Cir. 1991). Although Douglas and Janet Gunnink own Parcel One as joint tenants, a district court may order such a sale "even though an innocent third party also has an interest in the property, so long as the third party receives compensation." *Id.* (citing 26 U.S.C. § 7403(c) and *United States v. Rodgers*, 461 U.S. 677, 693-94 (1983)).

In *United States v. Rodgers*, the Supreme Court listed four factors to consider in § 7403 proceedings where the property in question is held jointly by a delinquent taxpayer and a non-liable third party: (1) "the extent to which the Government's financial interests would be prejudiced if it were relegated to a forced sale of the partial interest [owned by the delinquent taxpayer who is] actually liable for the delinquent taxes;"

(2) "whether the third party with a non-liable separate interest in the property would, in the normal course of events . . . , have a legally recognized expectation that the separate property would not be subject to forced sale by the delinquent taxpayer or his or her creditors;" (3) "the likely prejudice to the third party, both in personal dislocation costs" and potential undercompensation; and (4) "the relative character and value of the non-liable and liable interests held in the property." 461 U.S. at 710-11.

Concerning the first *Rodgers* factor, the question in this case is whether the value of Douglas Gunnink's interest in Parcel One, if it could be sold without dispossessing Janet Gunnink, would prejudice the Government's financial interest in satisfying the tax deficiency. Selling only Douglas Gunnink's interest in Parcel One, however, would be highly improbable and impractical so long as Janet Gunnink lives on and occupies the property. If such concern would prevent the Government from foreclosing on the property, this would severely prejudice the Government; a forced sale of only Douglas Gunnink's interest in Parcel One would net a much lower price and thus frustrate the Government's legitimate tax collection efforts. In light of this, selling only Douglas Gunnink's interest in Parcel One is not a realistic possibility, and this factor weighs in favor of the Government.

The second *Rodgers* factor, whether Janet Gunnink has a "legally recognized expectation" that her interest in Parcel One would not be subject to a forced sale, also weighs in the Government's favor. The record shows that Janet Gunnink acted with her husband to transfer the Farm to Prairie's Edge Trust in what this Court deems as an attempt to thwart the Government's legitimate tax collecting efforts. Moreover, Janet

Gunnink is aware that Parcel Two was sold by the MDOR in the past; she stated at her deposition that Parcel Two had been sold "for Minnesota tax purposes." (J. Gunnin Dep. at 68.)  In light of this earlier forced sale by the MDOR, Janet Gunnink could not have had an expectation that her interest in Parcel One could not be subject to a forced sale. Accordingly, the second *Rodgers* factor weighs in favor of the Government.

The third *Rodgers* factor, whether Janet Gunnink will suffer prejudice from the sale of Parcel One, also weighs in favor of the Government. Any potential inconvenience and prejudice that Janet Gunnink might endure must be balanced against the Government's ability to foreclose on the property under § 7403. Here, there is no evidence that Janet Gunnink would be undercompensated for her one-half interest if the Government is allowed to force the sale of Parcel One. Moreover, as the Eighth Circuit found in *Bierbrauer*, there is no evidence "that her personal dislocation costs [are] any greater than in any other foreclosure against a residence to satisfy a tax lien." 936 F.2d at 375. On balance, the Government's ability to compensate Janet Gunnink fully for her ownership interest in Parcel One from the proceeds of the sale and the lack of any evidence that her personal dislocation costs would exceed those present in any other foreclosure outweigh any prejudice that Janet Gunnink might endure.

The last *Rodgers* factor requires a court to "compare the character and value of the interests in the property." *Id.* (citing *Rodgers*, 461 U.S. at 710-11). There might be little reason to allow the sale where, for instance, the non-liable third party has a greater possessory or fee interest than the delinquent taxpayer, so that a forced sale would net the government only a fraction of the value of the property. *Id.* Such a mitigating

24

circumstance, however, does not exist here. Douglas and Janet Gunnink own Parcel One as joint tenants; thus, each holds a one-half interest in the whole of Parcel One, and both Douglas and Janet Gunnink currently reside on Parcel One. Neither Douglas nor Janet Gunnink has a greater possessory or fee interest in the Farm than the other. Moreover, aside from the tax liens described above, there is no evidence of other encumbrances on Parcel One. The last *Rodgers* factor weighs in favor of the Government.

The Supreme Court was careful to remind courts that the *Rodgers* factors are not a mechanical checklist to be used in place of common sense and consideration of any special circumstances. 461 U.S. at 711. Nonetheless, the "limited discretion accorded by § 7403 should be exercised rigorously and sparingly" in light of "the Government's paramount interest in prompt and certain collection of delinquent taxes." *Id.* Moreover, no evidence before the Court supports a finding that Douglas Gunnink has any substantial assets that could be seized to satisfy his outstanding federal tax debt. Despite the relocation costs and inherent inconvenience that Janet Gunnink will encounter, the Government's interest in collecting the delinquent taxes at issue can be satisfied only by the forced sale of Parcel One.

## 2. Parcel Two Should Be Sold

With respect to Parcel Two, the fact that Frauendienst and the Swensons are "not the assessed taxpayer in this matter and [have] an interest in the subject property does not preclude the United States from foreclosing upon its lien interests and obtaining a sale of the property." *United States v. Kimmell*, 2010 WL 1240579, at *2 (D. Colo. Mar. 22, 2010). Section 7403, however, does not require that a district court authorize a forced

sale; indeed, as stated above, the statute leaves some limited room for the exercise of reasoned discretion. *Rodgers*, 461 U.S. at 706. Accordingly, the Court will consider the *Rodgers* factors as they apply to Parcel Two.

First, the Government has shown that it would likely suffer prejudice if the Court ordered only a partial sale of the property and that this factor weighs in favor of foreclosure of Parcel Two. *See Kimmell*, 2010 WL 1240579, at *2. If the Government sold Parcel Two subject to the interests of Frauendienst and the Swensons, "in all likelihood potential purchasers . . . would not be likely to buy the property or would be unwilling to pay a fair market price" because the property would not come free and clear. *See United States v. D'Andrea*, 2010 WL 38428078, at *12 (D. Colo. Aug. 31, 2010). Thus, Parcel Two would be sold at a discount and the Government's financial interests would be significantly prejudiced.

Second, as set forth above, the tax lien for tax year 1997 was recorded almost a year before the MDOR sold Parcel Two to Frauendienst and two years before Frauendienst quit-claimed Parcel Two to herself and the Swensons. Accordingly, the Court determines that Frauendienst and the Swensons cannot show any legal expectation that Parcel Two would be protected from a forced sale.

Third, it is difficult to assert that any prejudice to Frauendienst and the Swensons caused by the force sale of Parcel Two would be mitigated because they would be compensated in proportion to their interest in Parcel Two after the tax lien is satisfied. In 2005, the tax lien in question was valued at $115,786.49, and Frauendienst purchased Parcel Two for $21,000.00. It should be noted, however, that Frauendienst could have

protected herself by any number of typical safeguards utilized by purchasers of real estate; she could have purchased title insurance, hired an attorney to issue a title opinion or obtain a relatively low cost search for whether any tax liens attached to Parcel Two. Nothing in the record, however, suggests she took any of these common precautions of real estate purchasers. Nonetheless, the third factor generally weighs in favor of Frauendienst and the Swensons.

Fourth, the Court has considered "the relative character and value of the non-liable and liable interests held in the property . . . ." *United States v. Pottorf*, 898 F. Supp. 792, 796 (D. Kan. 1995) (summarizing the *Rodgers* factors). This factor also weighs in favor of the Government. Frauendienst purchased the property for $21,000.00 to obtain what, according to the record before the Court, was a 100% interest in Parcel Two *subject to the tax lien*. In short, although Frauendienst and the Swensons are not personally liable for the tax obligation of Douglas Gunnink, Parcel Two was already diminished by the amount of the tax lien at the time Frauendienst first came into title. Thus, the value of Parcel Two when it was acquired was the fair market value minus the amount of the tax lien. At all times since Frauendienst first acquired Parcel Two, the property was subject to the tax lien for Douglas Gunnink's tax deficiency. Therefore, the Court concludes that the relative character and value of Frauendienst's and the Swensons' interest in Parcel Two are outweighed by the Government's.

In light of the *Rodgers* Court's clear guidance that "the limited discretion accorded by § 7403 should be exercised rigorously and sparingly, keeping in mind the Government's paramount interest in prompt and certain collection of delinquent taxes,"

461 U.S. at 711, this Court concludes that the *Rodgers* factors balance in favor of the forced sale of Parcel Two.

### E.  Conclusion

Based on the foregoing, the Court determines that the Government is entitled to summary judgment, the federal tax liens on the Farm should be foreclosed, and the Farm should be sold to satisfy those liens.

With respect to Parcel One, Douglas Gunnink and Janet Gunnink owned the property as joint tenants. As such, the federal tax liens for Douglas Gunnink's tax deficiency attached only to Douglas Gunnink's interest in Parcel One. *See Bierbrauer*, 936 F.2d at 376 (determining that a property owned in joint tenancy by federal tax debtor and a non-liable spouse could be sold where, *inter alia*, there was "no evidence that [the non-liable spouse] would be undercompensated" and sale would not "dispossess[] an innocent third party who has a substantially greater possessory or fee interest than the delinquent taxpayer's interest"). Accordingly, proceeds for the sale of Parcel One should be distributed as follows: (1) to the IRS for the administrative costs of the sale of Parcel One; (2) one-half of the remaining proceeds from the sale of Parcel One should go to the Government to be applied to the unpaid federal tax liabilities of Douglas Gunnink; and lastly, (3) one-half of the remaining proceeds from the sale should go to Janet Gunnink as compensation for her interest in Parcel One.

With respect to Parcel Two, Frauendienst purchased the property at the forced sale subject to the federal tax lien as shown above and subsequently executed a quit claim deed to herself, Cory Swenson, and Erin Swenson. Parcel Two, which was already

subject to the tax lien when it was acquired by Frauendienst, should be sold to satisfy the outstanding federal tax liens on the property. *See*, *e.g.*, *United States v. D'Andrea*, 2010 WL 38428078, at *13 (ordering the forced sale of property encumbered by the former owner's tax liens). As such, proceeds for the sale of Parcel Two should be distributed as follows: (1) to the IRS for the administrative costs of the sale of Parcel Two; (2) the remaining proceeds from the sale of Parcel Two should go to the Government to be applied to the unpaid federal tax liability for tax year 1997 of Douglas Gunnink that was noticed and recorded with Sibley County on May 12, 2005, and lastly, (3) any funds remaining after satisfying the tax lien noticed and recorded with Sibley County on May 12, 2005, shall be distributed among Rachael Frauendienst, Erin Swenson, and Cory Swenson according to their respect interests as compensation for Parcel Two.

## IV.   RECOMMENDATION

Based on the foregoing, and all the files records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** the Government's Motion for Summary Judgment (ECF No. 121) be **GRANTED** as set forth above.


Dated: January 23, 2015                  s/ Tony N. Leung
                                          Tony N. Leung
                                          United States Magistrate Judge
                                          District of Minnesota

                                          *United States of America v. Douglas Gunnink, et al.*
                                          File No. 12-cv-1528 (MJD/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that

specifically identify the portions of the Report to which objections are made and the basis of each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **February 23, 2015**.